## UNITED STATES DISTRICT COURT FOR DISTRICT OF NEW JERSEY

BRAD LAFFERTY,
CHRISTEN LAFFERTY,
BRAD LAFFERTY AND CHRISTEN LAFFERTY,     :
in their capacity of Guardians Ad Litem of their     :
minor daughter, EL, a minor,     :     CIVIL ACTION NUMBER:
CORRINE PROCAJLO,     :
SANDRA KEATING     :
LAUREN PROCAJLO,     :
MICHAEL DIGIOVANNI,     :     JURY TRIAL DEMANDED
SPENCER POPE,     :
LISA DIGIOVANNI,     :
GINA TARTAGLIA,     :     PLAINTIFFS CLASS ACTION
ANTHONY TARTAGLIA,     :     AND INDIVIDUAL COMPLAINT
SCOTT LITTLEFIELD,     :     FOR DAMAGES AND DEMAND
KRISTEN LITTLEFIELD     :     FOR JURY TRIAL
SCOTT AND KRISTEN LITTLEFIELD in their     :
capacity of Guardians Ad Litem of their     :
minor daughter, LL, a minor,     :
DAWN D'ORAZIO, AND     :
GINA HYNDMAN     :

in their individual capacity and on behalf of
others similarly situated

**PLAINTIFFS**

V.

THE SHERWIN WILLIAMS COMPANY, INC,
AND JOHN DOES 1 THROUGH 10, inclusive

**DEFENDANTS**

1. Declaratory Judgement
2. Medical Monitoring
3. Strict Liability
4. Negligence and Negligence Per Se
5. Fraud & Fraudulent Concealment
6. Negligent Misrepresentation
7. Private Nuisance
8. Strict Liability - Abnormally
   Dangerous Activity
9. Injunctive Relief

MITNICK LAW OFFICE, LLC
CRAIG R. MITNICK, ESQ
35 Kings Highway East
Haddonfield, New Jersey 08033

*Attorneys for Plaintiffs*

1

**UNITED STATES DISTRICT COURT FOR DISTRICT OF NEW JERSEY**

| | |
|---|---|
| BRAD LAFFERTY,<br>CHRISTEN LAFFERTY,<br>BRAD LAFFERTY AND CHRISTEN LAFFERTY,<br>in their capacity of Guardians Ad Litem of their<br>minor daughter, EL, a minor,<br>CORRINE PROCAJLO,<br>SANDRA KEATING,<br>LAUREN PROCAJLO,<br>MICHAEL DIGIOVANNI,<br>SPENCER POPE,<br>LISA DIGIOVANNI,<br>GINA TARTAGLIA,<br>ANTHONY TARTAGLIA,<br>SCOTT LITTLEFIELD,<br>KRISTEN LITTLEFIELD<br>SCOTT AND KRISTEN LITTLEFIELD,<br>in their capacity of Guardians Ad Litem of their<br>minor daughter, LL, a minor,<br>DAWN D'ORAZIO,<br>GINA HYNDMAN<br><br>in their individual capacity and on behalf of<br>others similarly situated<br>**PLAINTIFFS**,<br><br>**v.**<br><br>THE SHERWIN WILLIAMS COMPANY, INC,<br>AND JOHN DOES 1 THROUGH 10, inclusive<br><br>**DEFENDANTS** | CIVIL ACTION NUMBER: _____<br><br><br><br>JURY TRIAL DEMANDED |

_____

**PLAINTIFFS' CLASS ACTION COMPLAINT**

PLAINTIFFs, by and through their undersigned attorneys, Mitnick Law Office, LLC hereby files this Class Action Complaint, on behalf of themselves and all others similarly situated, against Defendants, The Sherwin-Williams Company and John Does 1 through 10, to obtain damages, both compensatory and punitive, injunctive relief, medical monitoring and costs of suit. Plaintiffs

allege the following upon information based on the investigation of counsel, except as to those allegations that specifically pertain to Plaintiffs which are alleged upon personal knowledge.

## THE PARTIES
### PLAINTIFFS

1.      PLAINTIFF BRAD LAFFERTY, individually, who has resided in Gibbsboro, New Jersey for over eight years and whose address is 38 Winding Way, Gibbsboro, New Jersey and who is married to Christen Lafferty and has not been diagnosed with Cancer or other adverse physical injury.

2.      PLAINTIFF CHRISTEN LAFFERTY, individually, who has resided in Gibbsboro, New Jersey for over eight years and whose address is 38 Winding Way, Gibbsboro, New Jersey and who is married to Brad Lafferty and has not been diagnosed with Cancer or other adverse physical injury.

3.      PLAINTIFFS BRAD LAFFERTY and CHRISTEN LAFFERTY, residing at 38 Winding Way, Gibbsboro, New Jersey, in their capacity as Guardians Ad Litem of their minor daughter, EL, a minor stricken with cancer (leukemia).

4.      PLAINTIFF CORRINE PROCAJLO, individually, who resides at 33 Winding Way, Gibbsboro, New Jersey and has not been diagnosed with cancer or other adverse physical injury.

5.      PLAINTIFF SANDRA KEATING, individually, who resides at 278 Marshall Avenue, Blackwood, New Jersey 08012. Plaintiff Sandra Keating exercised in public walking areas three times a week for approximately three years during which time she was diagnosed with Kidney disease.

6.      PLAINTIFF LAUREN PROCAJLO, individually, who previously resided at 16 Alden Road, Gibbsboro, New Jersey and who now resides at 36 Eastwood Drive, Voorhees, New Jersey and who has been stricken with cancer (Hodgkin's Lymphoma).

7.    PLAINTIFF MICHAEL DIGIOVANNI, individually, who resides at 10 Wexford Road, Gibbsboro, New Jersey and has not been diagnosed with cancer or other adverse physical injury.

8.    PLAINTIFF SPENCER POPE, individually, who resides at 33 Winding Way, Gibbsboro, New Jersey and who has not been diagnosed with cancer or other adverse physical illness.

9.    PLAINTIFF LISA DIGIOVANNI, individually, who resides at 10 Wexford Road, Gibbsboro, New Jersey 08026 and has not been diagnosed with cancer or other physical injury.

10.    PLAINTIFF GINA TARTAGLIA, an individual who resides at 11 Winding Way, Gibbsboro, New Jersey and has not been diagnosed with cancer or other adverse physical injury;

11.    PLAINTIFF ANTHONY TARTAGLIA, an individual who resides at 11 Winding Way, Gibbsboro, New Jersey and has not been diagnosed with any other adverse physical injury;

12.    PLAINTIFF SCOTT LITTLEFIELD, individually, who resides at 11 United States Avenue, Gibbsboro, New Jersey and has not been diagnosed with cancer or other physical injury.

13.    PLAINTIFF KRISTEN LITTLEFIELD, individually, who resides at 11 United States Avenue, Gibbsboro, New Jersey and has not been diagnosed with cancer or other physical injury.

14.    PLAINTIFFS SCOTT LITTLEFIELD AND KRISTEN LITTLEFIELD, residing at 11 United States Avenue, Gibbsboro, New Jersey, in their capacity as Guardians Ad Litem of their minor daughter, LL, a minor stricken with Cancer (Nueroblastona).

15.    PLAINTIFF GINA HYNDMAN, individually, who resides at 401 Orchard Avenue, Somerdale, New Jersey and who previously resided at 25 West Clementon Road, Gibbsboro, New Jersey for over 20 years and has been diagnosed with a learning disability.

16. PLAINTIFF DAWN D'ORAZIO, individually, who currently resides at 145 Ebbetts Drive, Atco, New Jersey and who previously lived at 25 West Clementon Road, Gibbsboro, New Jersey for 32 years and who has not been diagnosed with cancer or other physical injury.

**DEFENDANTS**

17.    DEFENDANT SHERWIN-WILLIAMS, is an Ohio Corporation whose principal place of business is located at 101 W. Prospect Ave. Cleveland, OH 44115. Upon information and belief, Sherwin-Williams Company is engaged in the development, manufacture, distribution and sale of paint, coatings and related products and conducts business in the United States, including New Jersey.

18.    DEFENDANTS JOHN JOES 1-10, are unknown individuals who were additionally responsible for the contamination as set forth in this action, and/or who have covered up and/or censored the extent of the contamination. These Defendants true identities have not yet been ascertained due to the unavailability of information from The Sherwin-Williams Company and the Borough of Gibbsboro, New Jersey.

## INTRODUCTION AND NATURE OF THE ACTION

19.    This is a civil action to secure redress from The Sherwin-Williams Company (hereinafter referred to as "Sherwin-Williams") and other unnamed Defendants for damages suffered by members of the putative classes defined below (the "Class Members").

20.    The action is brought pursuant to the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C. §§ 9601 et seq. ("CERCLA"); the Administrative Order on Consent (AOC) Index Number II CERCLA-02-99-2035 under date of September 29, 1999; N.J.S.A. 58:10-23.11, New Jersey Spill Compensation and Control Act and other controlling New Jersey law.

21.    Plaintiffs and members of the Class seek recovery against the Defendant Sherwin-William, in its capacity as the owner and operator of a paint and varnish manufacturing facility who occupied certain areas of land located within the State of New Jersey, County of Camden, Borough of Gibbsboro.

22.    Plaintiffs and members of the Class seek recovery against Defendants 1 through 10,

unnamed defendants who, in their capacity as agents of Sherwin-Williams, or in their capacity individually, are responsible for the contamination as set forth in this action, and/or who have covered up and/or censored the extent of the contamination.

23.    Sherwin-Williams was founded in 1866 and incorporated in the state of Ohio in 1884 and is engaged in the development, manufacture, distribution and sale of paint, varnish, coatings and related products.

24.    Sherwin-Williams owned a paint manufacturing contaminant facility and operated a paint manufacturing business on three separate parcels of land, all located within the state of New Jersey, County of Camden, Borough of Gibbsboro, from approximately early 1930 until early September of 1978.

25.    Sherwin-Williams conducted its' manufacturing operations, including the disposal of manufacturing waste products on three distinct areas of land in Gibbsboro. Since ceasing operations in 1978, all three land areas have been designated on the National Priorities list (NPL) and designated as Superfund Sites by the United States Environmental Protection Agency (hereinafter referred to as USEPA).

26.    The first site is known as the United States Avenue Burn Site (hereinafter referred to as "Burn Site"). The second site is referred to as the Route 561 Dump Site (hereinafter referred to as "Dump Site") and the third site is known as the Sherwin-Williams/Hilliard's Creek Site (hereinafter referred to as "Hilliard's Site"). Collectively these three land areas are hereinafter referred to as the "Sherwin-Williams Site".

27.    The Borough of Gibbsboro is located within central Camden County, New Jersey. The Borough is approximately 2.2 miles in size and is home to approximately 2,274 residents according to the 2010 United States Census. The Borough is located about 15 miles southeast of Philadelphia Pennsylvania. Land-use in this small community is comprised of a combination of commercial, industrial, open spaces, and residential zones.

28. The 2.2-mile area of land that encompasses the Borough of Gibbsboro, upon information, may be entirely contaminated with hazardous substances as defined by Appendix A of N.J.SA.C. 7:1E and the current EPA list of hazardous substances under CERCLA Section 302.4. This area of land (hereinafter referred to as the "Class Area") is populated with residential homes, small businesses, restaurants, commercial structures, public parks and walking areas.

29.    The "Hilliard's Creek" site encompasses approximately 60 acres and is bordered to the north by the Silverlake and to the east and west by residential dwellings, commercial buildings and businesses. To the south, the Hilliard's Creek area has open space and Woodland's. Hilliard's Creek is a third-order stream which flows westerly and junctions with the Cooper River about one mile west of the former paint manufacturing plant, prior to draining into Kirkwood lake. It is connected to Silverlake via an underground culvert beneath the former paint manufacturing plant. Hilliard's Creek and its' tributaries are also fed through a system of catch basins, storm sewers and coverts from the nearby roadways and potentially from groundwater recharge. This stream flows through the 56 acre Hilliard Creek wildlife refuge.

30.    The Burn Site is located to the east of United States Avenue and is bordered to the north by residential properties and to the east and south by commercial properties and undeveloped land. In the past, the Burn Site was used for wastewater sludge storage and the disposal and burning of paint by-product wastes. The area is 8-acres in size.

31.    The Dump Site is comprised of approximately 2.9 acres of land and is currently vacant. It is located to the west of Lakeview Road or Route 561, near the intersection with Milford and Crescent Roads. The site is bordered to the north by a shopping plaza and residential properties and to the east by Clement lake. To the south, it is bordered by residential properties.

32.    The Sherwin-Williams Site was originally developed in the 19th century as a saw mill and subsequently became a grain mill (USEPA 2006). In 1851, the John Lucas Company purchased the land and converted the existing facility into a paint manufacturing plant. John Lucas company manufactured paint, varnish and associated products from 1851 until 1930 when Sherwin-Williams acquired control of the Lucas Paint Company and the Sherwin-Williams Site that encompassed the manufacturing facility. Sherwin-Williams continued manufacturing operations under the brand name of Sherwin-Williams until September 1, 1978 when it vacated

the property.

33.     As part of its operations, Sherwin-Williams utilized and generated hazardous substances, including but not limited to lead, arsenic, pentachlorophenol, aluminum, manganese, iron, pesticides, polycyclic aromatic hydrocarbons, polychlorinated, biphenyls, cadmium, benzo-anthracene, benzo-pyrene, pyrene, copper, mercury, zinc, vanadium and benzene. *(September 29, 1999 Administrative Order of Consent) (See Exhibit A attached).*

34.     The toxic and ultra-hazardous properties of lead, arsenic, pentachlorophenol, aluminum, manganese, iron, pesticides, polycyclic aromatic hydrocarbons, polychlorinated, biphenyls, cadmium, benzo-anthracene, benzo-pyrene, pyrene, copper, mercury, zinc, vanadium and benzene have been well documented and known to the paint industry for over a century. In fact, the first reports of fatal blood disorders caused by benzene appeared in scientific literature as early as the 1890s. In 1999, a study conducted by the National Academy of Science found a causal connection between arsenic and several different types of cancer.

35.     As early as 1948, the American petroleum Institute (API) published the guideline that the only safe level of exposure to benzene was 0%.

36.     Epidemiological Studies and evidence during the 1970s confirmed that exposure to benzene and arsenic, among other carcinogens, was a cause of acute myelogenous leukemia.

37.     In August of 2007, the Department of Health and Human Services (DHHS), the Environmental Protection Agency (EPA), and the International Agency for Research on Cancer (IARC) concluded that arsenic and inorganic arsenic compounds, benzene, beryllium and beryllium compounds, cadmium and cadmium compounds are known human carcinogens.

38.     The National Institute of health in a 1999 study concluded that focusing on pentachlorophenol provides increased statistical power and precision, and demonstrates associations between hematopoietic cancer and pentachlorophenol.

39. In 2011, the National Institute of Health reported that "Pentachlorophenol is characterized as a likely carcinogen of lymphoma and hematopoietic neoplasm". A systematic review was conducted to explore two kinds of associations, one was between the workers exposed to PCP with lymphoma and hematopoietic neoplasm, the other was between childhood lymphoma and leukemia with their parents exposed to Pentachlorophenol.

40.    The International Agency for Research on Cancer (IARC) classifies benzene as "carcinogenic to humans," based on sufficient evidence that benzene causes acute myeloid leukemia (AML). IARC also notes that benzene exposure has been linked with acute lymphocytic leukemia (ALL), chronic lymphocytic leukemia (CLL), multiple myeloma, and non-Hodgkin lymphoma.

41.    The National Toxicology Program (NTP) is formed from parts of several different US government agencies, including the National Institutes of Health (NIH), the Centers for Disease Control and Prevention (CDC), and the Food and Drug Administration (FDA). The NTP has classified beryllium and beryllium compounds, arsenic and inorganic arsenic compounds, benzene, benz[a]anthracene, benzo[b]fluoranthene, benzo[j]fluoranthene, benzo[a]and pyrene, as known human carcinogens, all of which have been found on the Sherwin-Williams Site.

42. Additionally, the US Environmental Protection Agency (EPA) maintains the Integrated Risk Information System (IRIS), an electronic database that contains information on human health effects from exposure to hazardous substances. These include arsenic, cadmium, Pentachlorophenol, benzo-anthracen, as well as numerous other substances found within the Sherwin-Williams Site and surrounding areas.

43. According to published sample testing performed on the Sherman-Williams Site, hazardous substances found included Lead, Arsenic, Barium, Cadmium, Pentachlorophenol, Beryllium, Mercury Benzo(a)pyrene, Benzene, 1,2-Dichloroethene, Ethylbenzene, Methylene Chloride, Vinyl Chloride, Xylene, bis(2-ethylhexy) phthalate, 2-Methylnapthalene, Naphthalene, Benzo(a)anthracene, Benzo(b)fluoranthene, Benzo(k)fluoranthene, Indeno (1,2,3-cd)pyrene,

Antimony, Chromium, Copper, Selenium, Zinc, Vanadium, various Pesticides, Arochlor-1254, Arochlor-1260, Alumimum, Cobalt, Nickel, Dibenz(a,h)anthracene.

44.     The Sherwin-Williams facility included areas for the unloading of raw materials from railroad cars, raw materials tank forms including storage tanks, storage areas for drums raw materials, an industrial/domestic waste water disposal system, waste disposal areas for paint sludge, and drum cleaning areas. The paint company developed and maintained oil based paints, varnish, lacquer, and ready mix linseed oil paints. Raw materials used in the production of these products included lead oxide, zinc oxide, lead chromate, ferrous sulfuric, sulfuric acid, and various other solvents *(Public Health Assessment, New Jersey Department of Health and Senior Services, August 12, 2009).*

45.     The Sherwin-Williams facility was permanently closed on September 1, 1978 according to the United States Environmental Association (hereinafter referred to as the "USEPA").  The property was sold in June 1981 to developer Robert Scarborough who rebuilt the former paint manufacturing plant into a robust business complex known as the Paint Works Corporate Center and then later sold the land and corporate park to Brandywine Realty trust.

46.     The process by which Sherwin-Williams manufactured, stored and disposed of paint and paint by-products had the effect of releasing and omitting toxic chemicals and hazardous substances, including but not limited to lead, arsenic, benzene, barium and pentachlorophenol into the grounds, air and surrounding environment. Overtime these hazardous substances have migrated into surrounding corporate, business and residential properties *(September 29, 1999 Administrative Order of Consent).*

47.     To date, there has never been a cancer assessment, community or otherwise for the residents of Gibbsboro. However, upon information and belief, cancer continues to threaten the lives of so many residents and others spending substantial periods of time in the area.

48.     Plaintiff and Class Members, upon information and belief, allege that defendant Sherwin-Williams has been aware for many years (much earlier than 1978 when the company vacated the Gibbsboro site) that the Sherwin-Williams Site and surrounding residential, commercial and

public recreational areas were highly contaminated due to the company's past manufacturing operations.

49. On information, Sherwin-Williams had full knowledge of the commercial, residential and recreational building that was taking place on the "Sherwin-Williams Site" while all the time knowing that these retail, corporate and residential properties were being built on unsafe groundwater, soil and sediment levels.

50.    In April of 1975 the New Jersey Department of environmental protection (hereinafter referred to as NJDEP) inspected the former landfill area of the Sherwin-Williams Site and sampled existing groundwater. Based on the results of the sampling, hazardous substances including barium, lead, arsenic, and phenol were determined to be found in the groundwater at elevated levels that exceeded NJDEP and the USEPA safe background levels.

51.    In 1983, presence of an oily substance known as the petroleum seep was reported to the New Jersey Department of Environmental Protection. It was reported that the petroleum seep was emanating from the parking lot at one of the facilities located on the former Sherwin-Williams Site. Investigation of the petroleum seep indicated the presence of hazardous substances in the groundwater underlying the facility, as well as soil surrounding structures at the former plant. The following is a partial list of contaminants that were determined to exist during the seep sample testing: benzene, toluene, see-butyl benzene, p-Xylene, m-Xylene, ethyl benzene, n-Propyl benzene, 1,2,3 -trim ethylbenzene, 1,3,5-trimethylbenzene and tetrachloroethylene *(NJDEP 1990).*

52.    More than 10 years later, in February of 1994, the NJDEP conducted another inspection of the route 561 dump site. A greenish blue particle substance was found underground the site. In addition, another blue green material was also found on the ground service and in the wetland area surface water on the property *(September 29, 1999 Administrative Order of Consent).*

53.    Subsequently, in May of 1994, a follow-up site investigation was performed within the vicinity of the Sherwin-Williams Site. After collecting waste samples from an area of visible

burnt waste, results contained various hazardous metals including elevated levels of lead that were almost 3 times higher than the acceptable background levels of the State of New Jersey, as well as 3 times as high as acceptable background levels of the USEPA.

54.    In August of 1995, the USEPA collected sediment and surface water samples from various areas within the Sherwin-Williams Site. Unsafe levels of lead and arsenic concentrations were found that exceeded acceptable NJDPA and USEPA background levels.

55.    Lead, arsenic, benzene, methane and other hazardous substances found on the Sherwin-Williams Site are known by-products of paint and related paint manufacturing activities. Plaintiff and Class Members, upon information and belief, allege that these hazardous substances migrated into surrounding neighborhoods, retail centers and corporate parks where they were inhaled, ingested, or were otherwise contacted by people living, working and visiting the community.

56.    Air, land and groundwater contaminated by the Defendant's activities at the Sherwin-Williams Site have migrated for years, and continue to spread to further surrounding areas, with hazardous chemical levels exceeding acceptable NJDEP and USEPA regulatory background guidelines *(September 29, 1999 Administrative Order of Consent).*

57.    Upon information and belief, there are approximately 810 residential homes existing within the Borough of Gibbsboro, a borough that is only 2.2 miles in size. At least 50% of those homes (conservatively) are located within 1 mile of the center of the contaminated Sherwin-Williams Site.

58.    Hundreds of others living, working or otherwise present in the area surrounding the Sherwin-Williams Site have been exposed to, inhaled or otherwise ingested and/or contacted lead, arsenic, benzene and other hazardous chemicals, which has caused them personal injury and will continue to cause them increased risk of personal injury in the future.

59.    Moreover, as a result of Defendant's improper use and maintenance of the paint facility and Defendant's deliberate and intentional release, disposal and/or emission of hazardous

substances onto the Sherwin-Williams Site, these chemicals have migrated outward and continue to migrate into surrounding neighborhoods, lakes, creeks and onto commercial, residential and retail properties that are owned, occupied and controlled by residents of Gibbsboro and surrounding communities. This migration poses an elevated risk to the health and welfare of Gibbsboro residents, business owners and the public.
.

## JURISDICTION AND VENUE

60.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) because Plaintiffs and Sherwin-Williams are citizens of different states and the amount in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs.

61.     This Court has personal jurisdiction over Sherwin-Williams because this suit arises out of Sherwin-Williams contacts with this judicial district and because Sherwin-Williams has had continuous and systematic contacts with this judicial district. Sherwin-Williams is deemed to reside in this judicial district because its contacts are sufficient to subject it to personal jurisdiction here. Sherwin-Williams may be served with process by delivering a copy of the Summons and Complaint to its registered agent, Sherwin Williams Corporation, at its registered office, 101 West Prospect Avenue, Cleveland, Ohio 44115.

62.     Venue is appropriate in the District of New Jersey because the acts which give rise to this Complaint occurred and continue to occur within the District and the property that is the subject of this action is situated in this District.

## FACTUAL ALLEGATIONS

63.     Benzene, Arsenic, Cadmium, Pentachlorophenol and various other toxins are recognized as known human carcinogens that pose severe health risks to anyone who is exposed to them. There is a scientific causal link between Benzene and Leukemia. *(American Cancer Association).* Causal links have also been found between other diseases of the blood and blood forming systems, including various types of cancer. Moreover, exposure to Benzene, Lead, or Arsenic

can also weekend the immune and central nervous system causing a greater susceptibility to infection and illness *(United States Center for Disease Control).*

64.    The toxic ultra-hazardous properties of carcinogens have been well documented and known to the paint manufacturing industry for close to a century. In fact, the first reports of fatal blood disorders caused by benzene exposure appeared in scientific literature as early as the 1890s. As early as 1948, the American petroleum Institute published the guideline that the only safe level of exposure to benzene was 0%. Epidemiological studies and evidence during the 1970s confirm that exposure to benzene is a cause of acute myelogenous leukemia.

65.    Benzene, Arsenic, and Pentachlorophenol, as well as various other carcinogens, are contained on the list of chemicals known to the State of New Jersey to cause cancer. To date, many scientific studies have demonstrated that even low level exposure to some hazardous substances, even when the exposure is for a relatively short duration, can lead to blood disease and leukemia risk. The American Cancer Association defines Arsenic, Benzene and various other carcinogens as hazardous substances that are known to cause cancer, based on evidence from studies in both people and lab animals. "The link between Benzene and cancer has largely focused on leukemia and other cancers of blood cells" *(The American Cancer Association).*

66.    Exposure to hazardous substances, such as the ones listed above, can cause drowsiness, dizziness and unconsciousness. Long-term exposure to hazardous substances cause effects on the bone marrow and can cause anemia and various forms of cancer. Dissolved Benzene concentrations from paint by-products in groundwater at the Sherwin-Williams Site remain at concentrations more than the maximum contaminant level allowed by the NJDEP and by the USEPA.

67. According to the EPA, Lead contamination at Superfund sites, such as the Sherwin-Williams Site, presents a threat to human health and the environment. "Lead can be harmful to humans (particularly children) when ingested or inhaled. Over time, lead has become a common environmental contaminant at Superfund sites across the country".

68. The Agency for Toxic Substances and Disease Registry (ATSDR) has found that "exposure to Lead can happen from breathing workplace air or dust, eating contaminated foods, or drinking contaminated water. Children can be exposed from eating lead-based paint chips or playing in contaminated soil. Lead can damage the nervous system, kidneys, and reproductive system. Lead has been found in at least 1,272 of the 1,684 National Priority List Superfund sites identified by the Environmental Protection Agency (EPA) on the Agency's website. These sites include the Sherwin-Williams Sites in Gibbsboro, New Jersey.

69. Almost 79 years ago, the 1949 <u>industrial directory of New Jersey</u> documents that Sherwin-Williams manufactured paint, varnish, lacquers, dry colors and chemicals at its Gibbsboro plant, leaving large amounts of lead in the environment.

70.    Sherwin-Williams conducted its paint manufacturing operations, including the disposal of manufacturing waste products on the three distinct areas of land in Gibbsboro, New Jersey. All three Superfund sites according to the United States Environmental Protection Agency (USEPA). These three distinct land areas make up what is known as the "Sherwin-Williams Site".

71.    The three separate areas that make up the Sherwin-Williams Site include: *The Sherwin-Williams/Hilliard's Creek Site* (Hilliard's Creek*)*, *The United States Avenue Burn Site* (Burn Site) and *The 561 Dump Site* (Dump Site*)*.

    a. The Hilliard's Creek site encompasses approximately 60 acres and is bordered to the north by the Silverlake and to the east and west by residential dwellings, commercial buildings and small businesses. To the south, the Hilliard's Creek area has open space and Woodland's. Hilliard's Creek is a third-order stream which flows westerly and junctions with the Cooper River about 1 mile west of the former paint manufacturing plant, prior to draining into Kirkwood lake. It is connected to Silverlake via an underground culvert beneath the former paint manufacturing plant. Hilliard's Creek and its' tributaries are also fed through a system of catch basins, storm sewers and coverts from the nearby roadways and potentially from groundwater recharge. This stream flows through the 56 acre Hilliard Creek wildlife refuge.

    b. The Burn Site is located to the east of United States Avenue and is bordered to the

north by residential properties and to the east and south by commercial properties and undeveloped land. In the past, the burn site was used for wastewater sludge storage and the disposal and burning of paint wastes. The 8-acre area is heavily vegetated and partially fenced.

c. The Dump Site is comprised of approximately 2.9 acres and is currently vacant. It is located to the west of Lakeview Road or route 561, near the intersection with Milford and Crescent Roads. The site is bordered to the north by a shopping plaza and residential properties and to the east by Clement lake. To the south, it is bordered by residential properties.



72.    The Sherwin-Williams Site is situated within a naturally occurring topographic depression. This central part of this topographic low in Gibbsboro is defined by a series of ponds and lakes. Surface water runoff generated from the former paint facility area flows into the Silverlake, which is also located within the Sherwin Williams site. Overflow from the Silverlake discharges directly into several other creeks and lakes in the area. Some of the creeks flow directly through residential areas and commercial areas, as well as the Gibbsboro natural preserve which includes public walking trails for area residents. All water eventually discharges into the headwaters of the Cooper River that is located approximately 3/4 of a mile south west of the site.

73.    The Sherwin-Williams Site included areas for the unloading of raw materials from railroad cars, raw materials tank forms including storage tanks, storage areas for drums raw materials, an industrial/domestic waste water disposal system, waste disposal areas for paint

sludge, and drum cleaning areas. The company developed and maintained oil based paints, varnish, lacquer, and ready mix linseed oil paints. Raw materials used in the production of these products included lead oxide, zinc oxide, lead chromate, ferrous sulfuric, sulfuric acid, and various other solvents *(Public Health Assessment, New Jersey Department of Health and Senior Services, August 12, 2009).*

74.    The Sherwin-Williams Site was permanently closed on September 1, 1978 (Public Health Assessment, New Jersey Department of Health and Senior Services, August 12, 2009).  The property was sold in June 1981 to developer Robert Scarborough who rebuilt the former paint manufacturing plant into a business complex (Paint Works Corporate Center) and then later sold the land and business park to Brandywine Realty trust.

75.    The process by which Sherwin-Williams manufactured, stored and disposed of paint and paint by-products had the effect of releasing and omitting toxic chemicals and hazardous substances, including but not limited to arsenic, benzene and pentachlorophenol, known human carcinogens, as well as high levels of lead into the grounds, air and surrounding environment in violation of Section 101(14) of CERCLA, 42 U.S.C. Section 9601(14). Overtime these hazardous substances have migrated into surrounding corporate, business and residential properties.

76. The Burn Area site was used as disposal and burn site for paint wastes generated at the manufacturing facility. The EPA's National Priority List (NPL) website narrative for the United States Avenue Burn site indicates Sherwin-Williams operations included paint wastes and solvents being dumped and/or poured onto the ground surface and then burned. The report further states that the Burn Landfill was used by Sherwin-Williams for the disposal of paint wastes and the storage of sludge generated from the facility's wastewater treatment plant. ("*NPL, Site Narrative for United States Avenue Burn, Gibbsboro, New Jersey -USEPA*").

77. According to the EPA, Sherwin-Williams mixed raw materials and processed them in multiple buildings throughout the Sherwin-Williams Site., Nearly 200,000 gallons of naphtha, xylene, mineral spirits, toluene, solvent blends and aromatic were stored there. The operation included 20-foot-deep lagoons for wastewater and paint sludge; above-ground tank farms; a

railroad line and spur; drum storage areas; and large-scale manufacturing operations. From the mid-1800s until 1978 the EPA claims that Sherwin-Williams discharged materials from the lagoons directly into the creek; improperly stored and handled materials, leading to spills and releases; and allowed leaking tanks that resulted in "widespread contamination" involving "high levels of various contaminants. *(EPA; D and D media report, Cleanup Set for Sherwin-Williams Site, Thursday, June 4, 2015).*

78.    In April of 1975 the New Jersey Department of environmental protection (NJDEP) inspected the former landfill area of the Sherwin-Williams Site and sampled existing groundwater. Based on the results of the sampling, hazardous substances including barium, lead, arsenic, and phenol were determined to be found in the groundwater at elevated levels that exceeded acceptable New Jersey and USEPA background levels. *(September 29, 1999 Administrative Order of Consent).* Sherwin-Williams was advised of the finding yet their manufacturing activities continued without interruption until the manufacturing facility was closed by the company in early September of 1978.

79.    In 1983, presence of an oily substance known as petroleum seep was reported to the New Jersey Department of Environmental Protection. It was reported that the petroleum seep was emanating from the parking lot at one of the facilities located on the former Sherwin-Williams Site. Investigation of the petroleum seep indicated the presence of hazardous substances in the groundwater underlying the facility, as well as soil surrounding structures at the former plant. The following is a partial list of contaminants that were determined to exist during the seep sample testing: benzene, toluene, see-butyl benzene, p-Xylene, m-Xylene, ethyl benzene, n-Propyl benzene, 1,2,3 -trim ethylbenzene, 1,3,5-trimethylbenzene and tetrachloroethylene *(NJDEP 1990).*

80.    In 1991, three sediment and surface water samples were collected from Hilliard's Creek near Foster Avenue (USEPA 2006). Results indicated the presence of dinoctyl, phthalate, dibenzofuran, pentachlorophenol, benzene, xylenes, phenols, aluminum, arsenic, chromium, copper, lead, magnesium, pentachlorophenol, manganese, vanadium and zinc *(September 29, 1999 Administrative Order of Consent).*

81. As reported by the New Jersey Department of Environmental Protection, in June 1998, a

consulting firm collected sediment samples from a section of Hilliard's Creek located in the Hillard's Creek wildlife refuge. The original purpose of the sampling event was to obtain background samples for another site. However, sediment sampling results revealed elevated levels of lead, chromium, arsenic, and zinc. One sample result documented a lead level of 221,900 parts per million (ppm), equivalent to approximately 22% lead concentration.

82. On July 25, 1995, Agency for Toxic Substances and Disease Registry (ATSD) issued a report for the Burn Site. In that report conclusions were made that "soil and sediment at the site were contaminated with metal that pose a public health hazard. Roots of exposure to the site contaminants are by ingestion of contaminated soil or the inhalation of suspended dusts". The report further goes on to say "lead contamination is of particular concern because high concentrations of lead were found in bare surface soil in areas where children may play. Sediment sampling results also indicated that contaminants have migrated offsite and are present in sediment samples at levels of public health concern. Contact with these sediments Pose an additional source of contaminated exposure". *(September 29, 1999 Administrative Order of Consent).*

83.    In 1998, the Sherwin-Williams Site was referred for investigation to the USEPA from the NJDEP due to overwhelming documented contamination on the land, some of which has been detailed above. (Administrative Order on Consent for Removal Action, 1999). The NJDEP requested, in a letter under date of August 20, 1998, written to the EPA, that the EPA sample, characterize and dispose of all hazardous substances found at the Sherwin-Williams Site in such a way as to safeguard the local population *(Administrative Order on Consent for Removal Action, 1999).*

84.    Following the August 20, 1998 referral from the NJDEP, the USEPA conducted sampling operations in September 1998 to delineate the contamination and determine whether any contamination detected at the site would be eligible for removal action under federal law. The USEPA has identified and documented contaminant releases and threatens releases of hazardous substances, pollutants or contaminants including, but not limited to arsenic, cadmium, chromium, lead, Mercury and zinc into the environment at the former paint manufacturing site and adjacent lands. *(Administrative Order on Consent for Removal Action, 1999).*

85.    Later in the same year, the United States Environmental Protection Agency collected additional sediment, soil and surface water samples from Hilliard's Creek. The purpose of the testing was to determine the extent of lead contamination within the creek and the floodplain. Three sets of samples were collected from areas including the north Bank, the South Bank, and the center of the creek. Soil samples were collected on the north and south floodplains of the creek as well. The site results contained higher levels of lead and arsenic then those that are acceptable by the State of New Jersey and the USEPA.

86.    On September 29, 1999 Sherwin-Williams entered an Administrative Consent Order whereby they agreed to conduct a remedial investigation for the former paint operations site. This Administrative Order was entered into due to the hazardous substances that were found to be present in reported findings from soil and groundwater tests performed by the NJDEP and the USEPA prior to 1999. Many of those hazardous substances, including but not limited to Lead, Chromium, Barium, Benzophenone and Pentachlorophenol, exceeded NJDEP and USEPA acceptable background guideline limits.

87.    The September 1999 Administrative Consent Order states in relevant part that:

> "Exposure to the various hazardous substances present at the Site by direct contact, inhalation, or ingestion may cause a variety of adverse human health effects... and the conditions present at the Site constitute an imminent and substantial endangerment to public health, welfare, or the environment". (United States Environmental Protection Agency, Region II, Administrative Order on Consent for Removal Action, 1999) (See exhibit A attached).

88.    Also in 1999, the New Jersey Department of Health and Senior Services (NJDHSS) and the Agency for Toxic Substances and Disease Registry (ATSDR) concluded that an urgent health hazard existed to children and adults who lived, worked and visited the Sherwin-Williams Site areas. Even with this fact, continued development on contaminated land took place, including constructing public walking trails, constructing commercial establishments and renovating existing residential properties.

89.    In late June of the same year, an additional 155 soil samples were collected to define the extent of the lead in soil adjacent to Hilliard's Creek. The samples were analyzed and lead was detected in concentrations higher than acceptable EPA standards allow for, creating a health risk to residents, persons working in the contaminated areas, as well as to the public.

90.    In 2004, 39 samples were taken from Gibbsboro-Clementon road to downstream areas within the Sherwin-Williams Site and collected from Hilliard's creek and the adjacent wetlands area. The reported results found an array of chemicals, including but not limited to arsenic and lead. The results of each exceeded EPA environmental regulatory limits.

91.    Additionally, in 2004, 13 surface water samples were collected from the Hilliard's Creek area and the samples were analyzed for arsenic and lead. Maximum concentrations of arsenic and lead detected in the surface water exceeded their respective acceptable EPA environmental guideline limits. *(USEPA 2006).*

92.    In 2005, an additional 350 soil and settlement samples were collected from the Hilliard's Creek and wetlands area as part of an alleged remedial investigation by Sherwin-Williams. The samples were analyzed for the full list of analogical parameters, including pesticides and metals. Maximum concentrations of benzo-a-anthracene, benzo-fluoranthene, benzo-a-pyrene, antimony, arsenic, cadmium, chromium, copper, lead, selenium, vanadium, zinc, barium, beryllium and cobalt, were found to be present in the sediment. All samples in subsurface oil exceeded their respective acceptable environmental guideline limits *(USEPA 2006).*

93.    In November of 2006 the New Jersey Department of Health and Senior Services (NJDHSS) communicated with Gibbsboro, NJ officials to arrange for available sessions for residents to identify community concerns and to provide information to residents about exposure pathways and the contaminations that existed. Officials from the Borough of Gibbsboro did not express any interest to hold these sessions *(Public Health Assessment, New Jersey Department of Health and Senior Services, August 12, 2009)* and the USEPA did not attend any of the proposed sessions.

94. The Human Health Risk Assessment for the United States Avenue Burn Site, submitted in 2016 by Sherwin-Williams as per Administrative Order, Index No. II CERCLA-02-99-2035 of

September 1999 states in relevant part, the following:

a. "*Soil chemicals of potential concern (COPCs) included metals, cyanide, polycyclic aromatic hydrocarbon (PAH) compounds, polychlorinated biphenyl (PCB) compounds, pentachlorophenol, and volatile organic compounds (VOCs). Burn Site Suspect Material (BSSM) COPCs include metals, cyanide, pesticides, di-n- butylphthalate, and pentachlorophenol. Sediment COPCs included metals, cyanide, and PAHs. Surface water COPCs included metals and cyanide. Groundwater COPCs included metals, cyanide, PAHs, pesticides, VOCs, and pentachlorophenol. It should be noted that the COPCs in each medium were not necessarily COPCs in every exposure area*".

b. "*The analytes with the greatest contribution to risk or hazard varied by exposure area and receptor, but generally included the following COPCs:* **Soil**: *Arsenic, chromium, cobalt, cyanide, thallium, benzo(a)pyrene, pentachlorophenol;* **Groundwater**: *Arsenic, chromium, manganese, benzo(a)pyrene;* **Sediment**: *Arsenic, iron, benzo(a)pyrene;* **Surface Water**: *Arsenic, chromium, iron, thallium*".

c. "*Cancer risk and non-cancer hazard for the Resident exceeded EPA's target risk or HI in all exposure areas, and the risk was highest in the Burn Area. Ingestion of arsenic in groundwater was the largest risk/hazard contributor for the Resident. When groundwater exposure was excluded, the Resident still had risk and/or hazard exceedances in all exposure areas, but the risks and/or hazards were lower by up to three orders of magnitude*".

d. "*In summary, the highest risks and hazards were in the Burn Area. The highest risks and/or hazards were for the future Resident, with exposure to arsenic in groundwater as the greatest contributor. In soil, arsenic, chromium, iron, thallium, cyanide, and benzo(a)pyrene were the major contributors to risk or hazard. Pentachlorophenol was a major risk contributor for the LF area and BSSM only. Elevated lead risks were present for at least one receptor in all exposure areas where lead was a COPC*".

95.    The Sherwin-Williams Site is surrounded by residential properties with many of the residential homes located directly within the Sherwin-Williams Site and hundreds of others sitting on adjacent land surrounding the Sherwin-Williams Site.  Additionally, a public school, library, and the borough offices are located approximately 0.2 two miles west of the Paint Works Corporate Center. Hilliard Creek sits on the property and is accessible from residential backyards that lack continuous fencing. The area also encompasses walking trails for the public.

96.    Since learning of the contamination hazards as late as 1975 through sampling performed by the NJDEP, Sherwin-Williams failed to request that Deed notices be placed on any of the contaminated land or structures. In fact, it was not until August of 2017 that the USEPA began informing residents that deed notices will be placed on residential and commercial properties to govern how the land may be managed in the future.

97.    Defendant Sherwin-Williams has contaminated both public and private property, inadequately addressed the contamination they caused, and failed to warn plaintiffs and the public of the contamination it knew existed. Sherwin-Williams ignored the health hazards, concealed those hazards from residents by not engaging the community, or by not actively addressing the contamination that it caused, and failed to warn Plaintiffs and the public of the contamination it knew existed. Even with Sherwin-Williams failed clean-up to date, the company still portrays itself to the public as committed to the environment, health and safety.

*Continued on next page*



# GLOBAL ENVIRONMENTAL, HEALTH and SAFETY POLICY

The Sherwin-Williams Company is committed to global leadership and excellence in Environmental, Health and Safety (EHS) throughout our operations, businesses and products. In order to fulfill this commitment we develop, implement, and work to continually improve our global management systems, EHS standards and performance measures.

In pursuit of EHS Excellence worldwide we are committed to the following:

**Work Place -** We manage operational risks to provide workplaces that are safe and healthy for our employees, visitors, contractors, customers, and the communities in which we operate.

**Compliance -** We comply with all applicable EHS legal requirements, Sherwin- Williams standards and other adopted requirements.

**Sustainability -** We develop, manufacture, distribute and sell our products in a way that preserves resources and minimizes environmental impact.

**Training and Communication -** We train and communicate with our employees so they have the knowledge and skills to work in a safe and environmentally responsible manner, and take an active role in EHS management.

**Business Integration -** We integrate EHS considerations into business planning, goal setting, decision making and daily work.

**Customers -** We provide our customers with product information so they have the knowledge to use our products in a safe and environmentally appropriate way.

All Sherwin-Williams employees, individually and collectively are expected to understand, follow and promote this Policy

John G. Morikis
President and Chief Executive Officer

Sherwin-Williams Policy No. 603
Rev: 6

24

98.     Plaintiffs and Class Members have been exposed to hazardous substances, including, but not limited to, arsenic, lead, pentachlorophenol, aluminum, manganese, iron, pesticides, polycyclic aromatic hydrocarbons, polychlorinated, biphenyls, cadmium, benzo anthracene, benzo pyrene, pyrene, copper, mercury, zinc, vanadium and benzene generated from the manufacturing activities of Sherwin-Williams and Sherwin-Williams has concealed the extent of the contamination and has failed to disclose the hazards to the community.

99.     Defendant has repeatedly assured Plaintiffs and Class Members and the public that the paint manufacturing operations that took place on the Sherwin-Williams Site, as well as the contamination of the soil, sediment, pore water, surface water and groundwater did not present any real health risks and nothing to the contrary was provided to the Plaintiffs or Class Members. In fact, Defendant's lack of actions conveyed the exact opposite message than the facts warranted.

100.     It was not until August 2017, during a pre-scheduled EPA meeting in Gibbsboro, New Jersey that plaintiffs and Class Members truly became aware of the delayed and/or non-existent cleanup efforts and that the contaminated commercial and residential property they have been occupying had higher levels of hazardous chemicals than previously was communicated to them by Defendant.

101.     The assurances that the land is safe to residents, workers and the public have been, and continue to be, echoed by Defendant who has skewed the truth from Plaintiffs, Members of the Class and members of the public.

102.     Despite these misleading assurances, the presence of dangerous contamination from hazardous substances on these properties presents a significant health risk to those living on or near the sites, working in and around the sites and those using the sites for recreational activities.

103.     According to the EPA and the National Institute of Health, common injuries sustained from exposure to the types of hazardous substances found on the Class Area include: leukemia, lung brain and kidney cancer, blood disorders (such as aplastic anemia and myelodysplastic syndrome), non-Hodgkin lymphoma, brain damage, learning disorders, learning

disabilities, birth defects, breathing difficulties, various stomach, heart, kidney, and liver conditions and Nervous system disorders (reflex malfunction and headaches).

104.    Because of false assurances and concealment of the truth by Defendant, Plaintiffs, Members of the Class, and members of the public had no reason to believe that the land they live, work, and play on presented or currently presents a significant health risk.

105.    Defendant, a company experienced in paint manufacturing activities was, or should have been familiar with the risks posed by disposing and/or burning toxic chemicals contained or used in the production of paint and the subsequent contamination that would be created by engaging in such behavior.

106.    Despite its knowledge of the threat posed by their business operations, Sherwin-Williams improperly disposed of hazardous materials and failed to adequately reclaim and restore the land used in their operations.

107.    To this day, Sherwin-Williams continues to fail to adequately restore contaminated land that it once used and fails to disclose the true elevated levels of toxic chemicals known to be inherent in affected property. The Company has additionally failed to disclose the true health risks associated therewith, despite actual knowledge of same.

108.    Defendant Sherwin-Williams failure to properly restore the land has created an ongoing presence of contamination that has migrated outward from the originating site and has impacted Plaintiffs' and Class Member properties that sit on the "Class Area" and deprives Plaintiffs and Class Members of their free use and enjoyment of their property.

109.    The presence of elevated levels of toxic chemicals has posed, poses, and will continue to pose a significant health threat to the Class Members and to those within the "Class Area".

110.    Because of the actions of Defendant, hazardous substances at and from Defendant Sherwin-Williams manufacturing operations have entered onto Plaintiff and the Class Members' person, property, air, land, and dwelling, thereby causing them an increased and significant risk to their health (including cancer) necessitating medical monitoring.

111.    Plaintiffs and Class Members have incurred damages because of the contamination of their property by the improper and illegal disposal of hazardous chemicals by Sherwin-Williams.

112.    Plaintiff and Class Members have incurred damages as a result of the inadequate restoration activities of Sherwin-Williams and through endorsing the approval of the subsequently developed land into residential, commercial and public properties that were sold to homebuyers, businesses and the public, despite knowing that the land was and still is contaminated with hazardous substances and materials that expose Plaintiffs, Class Members and the public to dangerous health conditions, including Cancer.

113.    The hazardous chemicals that were released into the land and waterways scattered and migrated so that persons and properties in the area were and continue to be exposed to hazardous substances. Plaintiffs and Class Member properties and the public area properties have been contaminated with lead and hazardous substances, including but not limited to arsenic, benzene and pentachlorophenol.

114.    The presence of chemical contamination has been and continues to be a source of hazardous substance emissions onto and within the surrounding properties of the Sherwin-Williams Site. The waste contains, and has continuously released into the area, a variety of dangerous substances and cancer causing agents.

115.    Despite knowing that the immediate and surrounding land that the Sherwin-Williams facility operated on was contaminated and not restored, Defendant knowingly allowed the land to be developed and sold for residential and commercial purposes after assuring residents, businesses and the public that the land was safe.

116.    These assurances to the public have been, and continue to be, echoed by local public officials and health and environmental regulators who have concealed the truth from Plaintiffs, Class Members, and the public.

117.    Hazardous chemicals found in the soil and water of the site can penetrate the body and increase the risk for a diversity of diseases, including cancer. Inhaling or ingesting arsenic, lead and/or pentachlorophenol can increase the risk of leukemia, lymphoma, and bone cancer, specifically.

118.    Sherwin-Williams knew of the risks posed by the contamination on the land prior to vacating the site and selling the property to a commercial developer who developed the site and allowed others to develop retail establishments, restaurants, commercial buildings and homes to Plaintiffs and Class Members, yet chose not to remove the dangerous condition and protect the Plaintiffs and Class Members from what they knew was dangerous chemical exposure.

119.    A standard method for assessing whether health hazards exist to a community is to determine whether there is a completed exposure pathway from a contaminant source to a receptor population and weather exposures to contamination are high enough to be considered a health concern (ATSDR 2005).  An exposure pathway is a series of steps starting with the release of a contaminant in the environment and ending at the interface with the human body. A completed exposure pathway consists of five elements: source of contamination; environmental media and transport mechanisms; point of exposure; route of exposure, and receptor population. (Agency for Toxic Substances and Disease Registry (ATSDR) 2005).

120.    Based on the sampling data set forth above, as well as additional soil, groundwater and sediment samples not mentioned, exposure pathways for individuals who live, or lived in the area and surrounding areas of the Sherwin-Williams Site are as follows:

a.  *Ingestion of on-site contaminated soil from former facility areas. Residents including children, were and are currently being exposed to contaminants while living and engaging in outdoor recreational activities at the site. This exposure also includes visitors to the site.*

b. *Ingestion of contaminated soil from Hilliard's Creek floodplain and sediment from adjacent wetlands. Site related contaminants were detected in the floodplain soils of Hilliard's Creek and sentiment of adjacent wetlands. Area residents reported to have access to these areas in the past for recreational purposes, including swimming in the Hilliard's creek and adjacent lakes. Residents including children were and are potentially being exposed to contaminants during outdoor recreational activities.*

c.  *Ingestion of surface water from Hilliard's Creek. Site related contaminants have been detected in the Hilliard's Creek surface water. Residents including children, were and are exposed to contaminants during outdoor recreational activities including swimming in the creek.*

*d. Inhalation of indoor air. The onsite groundwater sampling results indicated the presence of contaminants. Currently the on-site buildings are occupied by various businesses. Local residences are also located on or near the property. Employees and residents may have been or currently are being exposed to groundwater contaminants in the indoor air of the buildings via vapor intrusion. Volatile chemicals in groundwater can migrate through subsurface soils and into indoor air spaces of overlying buildings (USEPA 202a; NJDEP 2005a).*

*e. Ingestion of biota from Hilliard's Creek. Biota (fish, game and plants). Wildlife in Hilliard's Creek, Kirkwood lake and adjacent areas we're exposed to contaminated soil and sediment. It is possible that's some local area residents grew plants and vegetables in their yards and adjacent areas, as well as fished at Hilliard's Creek and Kirkwood lake and then ate their catch. Since the contaminants detected in the sediment may bio-concentrate in the plants and in the fatty tissue of aquatic animals, contaminants may have been introduced into the food chain.*

121.    The Public Health Assessment, final release, regarding the Sherwin-Williams/Hilliard's Creek site that was prepared under date of August 12, 2009, was prepared for Sherwin-Williams under a cooperative agreement with United States Department of Health and Human Services and the Agency for toxic substances and Disease Registry. That report details the below conditions:

1. Non-cancer health effects;

2. Cancer effects;

3. Descriptions of contaminated chemicals;

4. Exposure scenarios;

5. Assessment of joint toxic action of chemical mixtures;

6. Childhood lead exposure and;

7. Childhood health considerations.

122.    Sherwin Williams knew and failed to disclose the fact that the land comprising the site is contaminated with hazardous materials, including, but not limited to the chemicals listed above. Given this, Plaintiffs and Class Members living, working and visiting the site area, and surrounding residential and commercial developments have been and continue to be exposed to hazardous levels that are significantly above acceptable NJDEP and USEPA background levels.

123.    Defendant Sherwin-Williams intentionally and/or negligently concealed and failed to disclose, and continue to conceal and fail to disclose, to Plaintiffs and Class Members material facts concerning the nature, extent, magnitude, and effects of the exposure of Plaintiffs and Class Members and/or their property to these toxic and hazardous substances.

124.    Defendants knew and/or reasonably should have known that Plaintiffs and Class Members and/or their property/s would be exposed to hazardous materials and contaminants. Defendants knew and understood, and/or reasonably should have known and understood, that its concealment of such information would subject and continue to subject Plaintiffs and Class Members, and/or their property to continued exposure to hazardous materials and contaminants.

125.    Despite this knowledge, Defendant did not take sufficient measures to prevent the contamination from being used in a manner that resulted in harm, or threatened harm, to the property, health, safety, and welfare of Plaintiffs and Class Members, and did not disclose to Plaintiffs or Class Members or to the public that the land upon which they resided, played or worked was contaminated and adverse to their health.

126.    Sherwin-William has claimed that they have done everything to protect the residents and visitors of Gibbsboro through their efforts since learning about the hazards in 1975. In fact, current soil and sediment cleanup at the Sherwin-Williams Site by Sherwin-Williams has not been "build on years of previous work conducted at the site to address immediate risks" as stated by the USEPA in a press release under date of July 17, 2017. Under previous orders by the New Jersey Department of Environmental Protection and the USEPA, Sherwin-Williams performed superficial and inadequate cleanup by:

    1. Removing only 8,096 cubic yards of sludge from a former lagoon area;

2. Removing only 44,785 gallons of liquid waste from the Site;

3. Installing a non-effective soil vapor extraction treatment system to reduce the volatile organic compounds in soil near only two former plant buildings;

4. Installed fencing on a small parcel of land that has not done anything to mitigate the hazardous waste and has only minimally limited exposure to one small area of the Sherwin-Williams Site and does not limit access or exposure to surrounding contaminated residential, commercial and public areas.

127. The superficial cleanup work performed by Sherwin-Williams over the past 40 years is inadequate and inherently flawed. This is evident from what was communicated and relayed to residents and others working in Gibbsboro who attended a pre-scheduled meeting hosted by the USEPA on August 10, 2017. *(See literature as Exhibit B and incorporated herein by reference).*

128. No one, including Sherwin-Williams, or its agents, notified Plaintiffs or Class Members of the true levels of all hazardous substances on the Class Area, let alone the elevated lead, arsenic and pentachlorophenol in and around their properties before, during or after the meeting on August 10, 2017 referenced above.

129. No one, including Sherwin-Williams, or its agents, notified Plaintiffs or Class Members of the significantly elevated presence of various other hazardous substances in and around their properties.

130. No one, including Sherwin-Williams, or its agents, notified Plaintiffs or Class Members of the internal concerns raised by various Federal and State environmental health agencies about the use of their properties.

131. No one, including Sherwin-Williams, notified Plaintiffs or Class Members of the fact that USEPA had considered emergency actions to remove the threats posed to people living, working and visiting the affected areas in Gibbsboro, New Jersey, nor were residents made aware that many of their properties had been determined to be highly likely to require action to be safe for residential uses.

132.    Plaintiffs and Class Members reasonably believed that the groundwater, air, soil, and natural resources at the former Sherwin-Williams Site and surrounding areas did not pose any greater health hazard than any other groundwater, air, soil, and natural resources.

133.    Plaintiffs and Class Members have each been exposed to hazardous substances due to Sherwin-Williams negligence in remediating and producing, handling, storing, disposing of, and/or failing to properly remediate hazardous substances contaminating the Sherwin-Williams Site and areas surrounding the Site.

134.    Plaintiffs, the Class Members, and their properties have each been exposed to hazardous substances due to Defendant's negligence arising from its' paint manufacturing facility and allowing development of the land without the adequate and appropriate testing, sampling, remediation, disclosures, warnings, and other precautions.

135.    Plaintiffs and Class Members seek redress and damages for economic losses, such as loss of property value and the interference with the use and enjoyment of their property; the prompt cleanup, excavation, treatment, and removal of hazardous wastes and related contaminants from their properties; medical monitoring; and punitive damages and other damages as the result of the carelessness, recklessness, negligence and willful and wanton violation of law by the Defendant.

136.    Separate and apart from acting negligently, at all relevant times Sherwin-Williams caused injury and damages to Plaintiff, the Class Members and/or their property through acts and omissions actuated by actual malice and/or accompanied by a wanton and willful disregard of persons who foreseeably might be harmed by such acts or omissions.

137.    Sherwin-Williams, despite its knowledge of the serious health and environmental effects associated with hazardous waste, released, discharged, stored, mishandled, exposed, processed, enhanced, disposed of and dumped hazardous waste throughout the Gibbsboro area and the surrounding environment, while failing to warn the public in general of the dangers that the historical use of the property posed.

138.    Sherwin-Williams, despite its knowledge of the serious health and environmental effects associated with the disposal of hazardous waste, and despite continued warnings from health and

environmental regulators, masked the true extent of contamination and its associated risks, thereby enabling it to avoid taking all appropriate steps to properly remediate these properties.

139.    Sherwin-Williams, despite its knowledge of the serious health and environmental effects associated with the disposal of hazardous waste, and despite continued warnings from health and environmental regulators, masked the true extent of contamination and its associated risks, thereby enabling new residential and commercial businesses to locate themselves in affected areas and surrounding affected areas.

140.    Sherwin Williams, despite its knowledge of the serious health and environmental effects associated with hazardous waste exposure, and despite orders and warnings from health and environmental regulators, failed to properly remediate or eliminate such hazardous waste in the affected areas.

141.    These toxic chemicals have damaged and can continue to damage Plaintiffs and Class Members health and property.

142.    Plaintiffs and Class Members, upon information and belief allege that defendants have known or should have known that the Sherwin-Williams site contained hazardous and toxic levels of hazardous substances, namely lead, arsenic, and benzene, as well as other toxic substances.

143.    Plaintiffs and Class Members allege that Defendant engaged in ultra-hazardous activities at the site, including but not limited to the use, handling, storage, production, emission, release and/or discharge of toxic and hazardous materials into the air and the environment at and around the Sherwin-Williams Site.

144.    Specifically, among other activities at the Sherwin-Williams Site, Sherwin-Williams deliberately and intentionally maintained and left behind large deposits of hazardous paint by-products at the Sherwin-Williams Site and eventually closed the toxic facility on or about September 1, 1978.

145.    Plaintiffs and Class Members upon information and belief allege that Sherwin-Williams has been aware since 1975, if not earlier, that their operations have caused danger to residents

and businesses located on or surrounding the Sherwin-Williams Site. Lead, arsenic, benzene and methane, all known by-products of paint, leaked into the surrounding neighborhoods and business properties where it was and continues to be inhaled, ingested, or otherwise contacted by people living and working in the community, including Plaintiffs and Class Members.

146.    Air, land and groundwater contaminated by the manufacturing activities at the Sherwin-Williams Site have migrated over the years, and continue to spread to surrounding neighborhoods and business areas, at levels in excess of New Jersey and Federal regulatory limits.

147.    On information, over 2,200 people reside within the Borough of Gibbsboro and all have been affected and exposed to contamination by defendant's emissions of Lead, Arsenic, Benzene, Mercury, Methane, as well as other hazardous substances found on the land and in the groundwater. Hundreds of other people living, working or otherwise present in the area surrounding the Sherwin-Williams Site have been exposed to, inhaled or otherwise ingested and/or contacted these hazardous substances emitted from the Sherwin-Williams Site, which has caused them personal injury and will continue to cause them increased risk of personal injury in the future.

148. Further, such acts obstruct Plaintiffs and Class Members enjoyment of their properties in that fugitive emissions and/or other matter is blown and/or transported by surface or groundwater across the surrounding communities and is breathed, ingested, or otherwise contacted by members of the community, and is deposited on and in the real and personal property of the surrounding areas to the Sherwin-Williams Site, causing physical damage to such property.

149.    As a result of Defendant's conduct in connection with their facilities at the Sherwin-Williams Site, Plaintiffs and Class Members have suffered and will continue to suffer from great physical, mental and nervous pain and suffering, including the fear of cancer. Plaintiffs and Class Members have incurred the cost of medical treatment, and believe that they will be compelled to seek further treatment in the future for care of the injuries sustained as a direct result of defendants conduct.

150.    As a further result of Defendant's conduct in connection with their manufacturing

operations at the Sherwin-Williams Site, Plaintiffs and Class Members have suffered and will continue to suffer damage to their real and personal properties, including but not limited to diminution in the value of their properties, as well as past, present and future loss of use and enjoyment of their properties.

151.    Additionally, as a result of Defendants improper use and maintenance of the Sherwin-Williams Site and Sherwin-Williams deliberate and intentional release, disposal and/or emission of hazardous substances on or around the site, these chemicals have migrated and continue to migrate into surrounding neighborhoods and onto properties owned, occupied and controlled by residents of surrounding communities, and causing such properties to be contaminated and damaged.

152.    Moreover, Defendants acted fraudulently by concealing and deceiving Plaintiffs and Class Members about Defendants release of toxic substances from the Sherwin-Williams site, and the existence of such hazardous substances in the air, groundwater, surface and subsurface soil and environment, were willful, malicious, intentional, and undertaken with a conscious disregard for the rights and the safety of the Plaintiffs and Class Members. Defendants fraudulent, willful, malicious and intentional acts have caused Plaintiffs and Class Members to suffer great harm.

153.    Despite being required to do so by Federal regulations and New Jersey law, Defendants failed to disclose to the public, including Plaintiffs and Class Members, that inhalation, ingestion, or other dermal contact of or with lead and Arsenic, as well as other toxic substances emanating from the Sherwin-Williams site are carcinogenic to humans. Defendant Sherwin-Williams wrongful conduct was purposeful and deliberate, and Defendant acted with conscious and reckless disregard of the hazards and health threats to Plaintiffs and Class Members. Defendant's conduct was and still is outrageous, willful, malicious and intentional. Defendant has caused Plaintiffs and Class Members great and irreparable harm. Plaintiffs and Class Members are therefore entitled to recover punitive or are exemplary damages from the defendant.


**LIABILITY**

154. Sherwin-Williams is liable for their actions under New Jersey applicable law, including the New Jersey Spill Compensation and Control Act, N.J.S. 58:10-23.11, et seq. (Spill Act, the Act), as well as the Federal Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C. §§ 9601 et seq. ("CERCLA);

**LIMITATIONS DOES NOT BAR ANY OF THE CLASS MEMBERS' CLAIMS**

155.    Plaintiffs and Class Members re-allege and incorporate by reference all preceding paragraphs.

156.    As a result of the acts and omissions of Defendant, under the delayed discovery doctrine, Plaintiffs or Class Members could not have reasonably known or have learned through the exercise of reasonable diligence that their properties and business establishments were contaminated with significantly elevated levels of arsenic, lead, benzene and other hazardous substances and that those risks were the direct and proximate result of Defendant acts and omissions in inadequately restoring the land on and surrounding the Sherwin-Williams Site. Thus, the applicable limitations periods did not begin to accrue until Plaintiffs discovered, or through the exercise of reasonable diligence should have discovered, Defendant's tortious acts and omissions.

157. Plaintiffs and Class Members were never notified by Sherwin-Williams, the Borough of Gibbsboro, or any other state or federal agency of the existence of the high levels of hazardous substances by way of letter, email, or verbal communication until the EPA meeting on August 10, 2017.

158.    In addition, the running of any statute of limitations has been tolled by Defendant's fraudulent concealment. Defendant, through its' affirmative misrepresentations and omissions, actively concealed from Plaintiffs and Class Members the true hazardous contamination present on their properties and businesses.

159.    Furthermore, Defendant is equitably estopped from asserting any limitations defense

because of its fraudulent concealment of the true character, quality and nature of the exposure of hazardous substances.

# CLASS ALLEGATIONS

160.    Plaintiffs and Class Members repeat and re-allege every allegation above as if set forth herein in full.

161.    Plaintiffs and Class Members bring this lawsuit as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b), on behalf of itself and all others similarly situated as members of the following Overall Class and Injured Subclass (collectively, the "Classes") on their respective federal and state claims.

162.    The proposed Classes are defined as:

> a. Overall Class:  All persons who reside or operate their business within the borough limits of Gibbsboro, New Jersey and have no known medical diagnosis of cancer or other adverse medical condition.

> b. Injured Subclass:  All persons who reside or operate their business within the borough limits of Gibbsboro, New Jersey and have been diagnosed with an adverse physical condition, including cancer.

163.     Excluded from the Classes is Defendant, including any entity or division in which Defendant has a controlling interest, as well as their agents, representatives, board members, directors, officers, employees, trustees, parents, children, heirs, assigns, subsidiaries and successors, and other persons or entities related to, or affiliated with Defendants.

164.     Excluded from the classes are any local, state, or federal government entities.

165.     Plaintiffs and Class Members reserve the right to amend the Class definitions if discovery and further investigation reveal that any Class should be expanded, divided into additional subclasses under Rule 23(c)(5), or modified in any other way.

166.    Certification of Plaintiffs and Class Members claims for class-wide treatment is appropriate because Plaintiffs and Class Members can prove the elements of its claims on a class-wide basis using the same evidence as would be used in an individual action alleging the same claims.

167.    This action has been brought and may be properly maintained on behalf of each of the Classes proposed herein under Federal Rule of Civil Procedure 23 and satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of its provisions.

168.    **Numerosity**. Plaintiff does not know the exact size or identities of the members of the proposed Class, since such information is not documented and not available to Plaintiffs and Class Members.  However, based on investigative reports, Census reports, and the Borough of Gibbsboro's website, Plaintiffs and Class Members believe that both the Classes encompass many hundreds and perhaps more than a thousand persons and entities. Therefore, the proposed Class is so numerous that joinder of all members is impracticable.  Further, based upon the injuries known to Plaintiffs and Class Members, as well as the average house value in Gibbsboro and other damages as enumerated herein, Plaintiffs believe that the amount in controversy exceeds $5 million.

169.    **Existence and Predominance of Common Questions of Law and Fact**.  All members of the respective Classes have been subject to, and affected by, the same conduct. These questions include, but are not limited to, the following:

a. Whether Sherwin-Williams discharged (or caused any other condition of pollution) a hazardous substance into the land or water on or under the respective Class Area;

b. Whether Sherwin-Williams is strictly liable for discharging (or caused any other condition of pollution) a hazardous substance into the land or water on or under the Class

Area.

    c. Whether Sherwin-Williams, through its acts or omissions, is strictly liable for the contamination on, in, and around the Class Area under Title 7 of the N.J.A.C.

    d. Whether Sherwin-Williams was negligent in its contaminating, reclaiming, handling, storing, remediating, using, and disposing the presence of hazardous substances and related contamination in the Class Area;

    e. Whether Sherwin-Williams, through its acts or omissions, proximately caused property damage, diminution of property values, cleanup costs and health risks due to hazard substances and related contaminants deposited, released, enhanced, or abandoned in the Class Area;

    f. Whether Sherwin-Williams, through its acts or omissions, deprived Class Members of the free and reasonable use and enjoyment of their properties due to the contamination of neighboring properties in the Class Area;

    g. Whether Class Members, through Sherwin-Williams acts, omissions and/or discharges (or other condition of pollution), have suffered damages, including but not limited to economic damages; and

    h. Whether, as a proximate result of Sherwin-Williams's conduct, the Overall sub-class members are at a significantly increased risk of disease due to exposures to Sherwin-Williams's hazard substances, such that they will benefit from ongoing medical monitoring.

    i. Whether Plaintiffs and the Class members are entitled to restitution, statutory, or punitive damages, disgorgement, injunction, specific performance, or other relief;

    j. Whether any applicable statute of limitations should be tolled due Plaintiffs and the Class members' inability to discover the extent of the conduct and/or damages complained

of herein or due to Sherwin-Williams fraudulent concealment of the true nature and extent of the contamination.;

170.        These questions of law and/or fact are common to the Class and predominate over any questions affecting only individual Class Members.

171.        All members of the Class have been subjected to and affected by a uniform course of conduct by Defendants that was designed to increase Defendants' income, sales, and reputation through, inter alia:

(a)        making false misrepresentations to Plaintiffs and Class members regarding the contamination or extent of contamination to their persons and properties;

(b)        knowingly concealing the truth about the contamination and its foreseeable and significant impact on residents, business owners and the public's health and welfare;

(c)        not cleaning-up or restoring the affected land areas in a reasonable timeframe;

(d)        evading any issue of the true extent of the contamination or restoration of the contaminated land.

172.        **Typicality.** The claims asserted by Plaintiffs are typical of the claims of the Sherwin Williams Overall Class and Medical Monitoring Class, as well as the Injured Class, as required by Fed. R. Civ. P. 23(a)(3), in that all claims are based upon the same factual and legal theories. The principal issues in this matter involve Sherwin-Williams conduct in wrongfully handling, releasing, discharging (or other condition of pollution), enhancing, storing, transporting, processing, disposing of, and/or failing to remediate, its toxic and hazardous manufacturing wastes and substances and by-products as well as its reckless and negligent decision to conceal the true extent of the contamination and conscience decision to allow residences, businesses and corporate entities to develop these hazardous lands into residences where people live, work, and play, which impact all Class Members.

173.        **No Conflict**. The claims of the individually named Plaintiffs is typical of the claims of the Classes and do not conflict with the interests of any other members of the Classes in that Plaintiffs and the other members of the Class were subject to the same conduct of Sherwin-Williams.

174**.**        **Adequacy of Representation**. Plaintiffs will fairly and adequately represent the interests of the Classes. Plaintiffs are committed to the vigorous prosecution of the Classes' claims and have retained attorneys who are qualified to pursue this litigation and have experience in class actions, including personal injury actions.

175**.**        **Superiority**.  A class action is superior to other methods for the fast and efficient adjudication of this controversy.  A class action regarding the issues in this case does not create any problems of manageability.  A class action is superior to all other available means for the fair and efficient adjudication of this controversy.  The damages or other financial detriment suffered by individual Class members is relatively small compared to the burden and expense that would be incurred by individual litigation of their claims against Defendants.  It would thus be virtually impossible for the Classes, on an individual basis, to obtain effective redress for the wrongs done to them.  Furthermore, even if Class members could afford such individualized litigation, the court system could not.  Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts.  Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action.  By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances here.

176.        **Class certification.** Class certification is appropriate pursuant to Fed. R. Civ. P. 23(b)(1) because the prosecution of separate actions by individual members of the classes would create a risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for Sherwin-Williams and/or because adjudications respecting individual members of the class would, as a practical matter, be dispositive of the interests of the other members or would risk substantially impairing or impending their ability to prosecute their interests.

177.        **Efficiency**. Maintenance of this action as a class action is a fair and efficient method for adjudication of this controversy. It would be impracticable and undesirable for each member of the class who has suffered harm to bring a separate action. In addition, the maintenance of separate actions would place a substantial and unnecessary burden on the courts and could result in inconsistent adjudications, while a single class action can determine, with judicial economy, the rights of all members of such class. No unusual difficulties are likely to be encountered in the management of this action as a class action.

## Medical Monitoring - The Overall Class

178.        In addition, Plaintiffs and the members of the "Overall Class" are also members of the Medical Monitoring Class who allege that:

a. Plaintiffs and the Medical Monitoring Class Members (subclass that have each been exposed to toxic and hazardous substances, including cancer causing agents), due to Defendants' improper and unlawful disposal of hazardous materials on the land and in handling, storing, use, disposal and/or failure to properly remediate such toxic and hazardous substances.

b. The toxic and hazardous substances, including cancer causing agents, at issue in this case are known and proven hazardous substances.

c. As a proximate result of the exposure to toxic and hazardous substances, including cancer causing agents, Plaintiffs and the Overall Class Members have a significantly increased risk of contracting serious latent diseases, including, without limitation, cancer.

d. A monitoring procedure exists that makes early detection of these potential diseases possible.

e.  The prescribed monitoring regiment is different from that normally recommended in the absence of exposure to toxic and hazardous substances.

f.  The prescribed monitoring regiment is reasonable and appropriate according to contemporary medical and scientific principles.

g. A monitoring procedure exists that makes early detection of these potential diseases possible.

h.  The prescribed monitoring regiment is different from that normally recommended in the absence of exposure to toxic and hazardous substances.

i.  The prescribed monitoring regiment is reasonable and appropriate according to contemporary medical and scientific principles.

## COUNT I
### STRICT LIABILITY

179.    Sherwin-Williams wrongful acts and omissions in releasing and discharging (or other conditions of pollution) toxic pollutants, hazardous substances and other contaminants onto the lands and water of the state of New Jersey, Borough of Gibbsboro in general and as is alleged in more detail above, was in violation of numerous environmental statutes in the State of New Jersey, including but not limited to the following:

a. Discharging (or other condition of pollution) of any pollutants or hazardous substances into or upon land (or water) in violation of N.J.S.A. 58:10, 23.11, N.J.S.A. 58:10, 46 to 50, N.J.S.A. 13:1K1 et seq., and N.J.S.A.13:1D 125 through 133 and;

.    b. Failure to immediately remediate, contain, remove and abate the discharges in violation of applicable New Jersey and Federal law.

180.         Plaintiffs are each a "person[s]" who may bring a cause of action for damages.

181.         Plaintiffs have alleged damages resulting from Sherwin-Williams discharge of hazardous substances onto their land, as those terms are defined in N.J.S.A. 58:10-23.11 Appendix 1, and "environmental hazardous substances" on the environmental hazardous substance list adopted by the Federal Government pursuant to section 4 of P.L.1983, c.315 (C.34:5A-4);

182.         Sherwin Williams is strictly liable for damages to Plaintiffs and the Class Members resulting from such discharges (or other conditions of pollution) covered by New Jersey Spill Compensation and Control Act, N.J.S. 58:10-23.11and Plaintiffs and the Class Members are not required to plead or prove negligence in any form or manner, because it is sufficient to plead and prove, as set forth in various paragraphs above, that the prohibited discharges or other polluting conditions occurred (See Exhibit C attached)

183.         Sherwin Williams acts and omissions violate numerous New Jersey Department of Environmental Protection (NJDEP), as well as United States Environmental Protection Agency (UNEPA) standards as well as other state and federal standards adopted by the NJDEP including, inter alia, the New Jersey Spill Compensation and Control Act, N.J.S. 58:10-23.11.

## COUNT II

### NEGLIGENCE AND NEGLIGENCE PER SE

184.         At all relevant times hereto, Defendant owed to Plaintiffs and Class Members who foreseeably could be injured by its negligence, a duty to exercise reasonable care in releasing, reclaiming, restoring, discharging (or other conditions of pollution), concentrating, freeing, or stockpiling toxic contaminants, including hazardous substances, that it knew, or should have known, could result in damage and injury to Plaintiffs, Class Members and their property.

185.         Defendant also owed a duty of care to Plaintiffs and Class Members to exercise reasonable care in the use of contaminated land for residential and commercial uses, to include

living, working, and playing.

186.     These duties to exercise reasonable care arose out of the common law of New Jersey, as well as relevant Federal and state environmental statutes and regulations, including Applicable Legal Standards.

187.     Defendant breached its' duty, over a period of years, in at least the following respects:

    a.    Sherwin-Williams failed to adequately restore its manufacturing lands in a manner that returned the land to its original condition prior to ceasing manufacturing operations, as required by New Jersey law, statutes, and regulations.

    b.    Sherwin-Williams acted with knowledge of the widespread presence of contamination in the form of hazardous substances that became lands forming the Class Area, along with the knowledge of the health and environmental risks that these hazardous substances posed for those engaged in residential, commercial and recreational activities on these lands, and despite the fact that Sherwin-Williams continued manufacturing operations and eventually sold their land and ultimately profited by using these contaminated lands and placing them into commerce for private development.

    c.    Failing to safely and properly remove and dispose of the hazardous substances.

    d.    In failing to warn Plaintiff and Class Members of the contamination on, in, and around their properties, and the risks that it posed to them and to their families, and the likelihood that they were being exposed to carcinogenic substances.

188.     As a result of Sherwin Williams acts and omissions, as detailed above, extensive contamination has existed, exists and will continue to exist and has been documented in the Class Area.

189.        As a result of Defendant's misconduct as set forth herein, Plaintiffs and Class Members have suffered and continue to suffer damages, including, but not limited to, the loss of value to their property and the loss of the use and enjoyment of their property and an increased risk of serious latent injury/illness.

190.        At all relevant times, Sherwin-Williams caused injury and damages to Plaintiffs and the Class Members and/or their property through acts and omissions actuated by actual malice and/or accompanied by a wanton and willful disregard of persons who foreseeably might be harmed by such acts or omissions.

191.        Defendant, despite its knowledge of the serious health and environmental effects associated with exposure to such hazardous substances, transferred contaminated lands with knowledge that they would be developed for residential and/or commercial use that were unfit for residential or commercial purposes due to the presence of elevated levels of contamination in the form of hazardous chemicals, on, and around the land comprising the Class Area and subsequently failed to warn Plaintiffs, the Class Members, and the public of the dangers such activities posed.

192.        Defendant, despite its knowledge of the serious health and environmental effects associated with hazard material exposure masked the true extent of contamination, thereby enabling the Defendant to avoid taking all appropriate steps to properly remediate the hazardous substances, on, and around the Class Area and to remediate and mitigate the dangers created by its development of contaminated land.

193.        As a direct and proximate result of the Sherwin-Williams wrongful acts and omissions, Plaintiffs and Class Members properties have been and will continue to be contaminated and unfit for residential, commercial and routine contact.

194.        As a direct and proximate result of the Defendant's wrongful acts and omissions, Plaintiffs and Class Members currently suffer an increased risk of serious latent disease, including a number of types of cancers that are associated with exposure to hazardous substances.

195.         As a direct and proximate result of the Defendant's wrongful acts and omissions, Plaintiffs and Class Members currently suffer property damage, diminution in the value of their property, cleanup costs, loss of use and enjoyment of their property, serious injury and destruction of their community.

196.         Because Defendant's acts and omissions violated the Applicable Legal Standards, referred to above, in addition to breaching the common-law duty of care, Defendant's acts and omissions constitute negligence per se.

197.         Plaintiffs and Class Members seek to recover against the Defendant for property damage, including diminution of property values, the cost of remediation of properties, as well as the cost of periodic medical examinations necessary to detect the onset of physical harm that may be caused by the exposure to hazardous contaminants on and around Plaintiffs property.


## COUNT III
## FRAUD AND FRAUDULENT CONCEALMENT

198.         Defendant concealed or failed to disclose material facts to Plaintiffs and Class Members, including, without limitation, that its former paint manufacturing lands contain elevated levels of hazardous contamination, including but not limited to arsenic, lead, dinoctyl, phthalate, dibenzofuran, pentachlorophenol, benzene, xylenes, phenols, aluminum, chromium, magnesium, pentachlorophenol, manganese, vanadium and zinc which it has known about over 40 years, and the elevated cancer and other adverse health risks posed by the presence of these hazardous substances in and around these residential and commercial properties.

199.         Defendant knew or should have known about these material facts. Not only does Sherwin-Williams have extensive experience in the paint manufacturing industry, but it was expressly put on notice of the elevated hazardous substance levels on its former manufacturing lands in Gibbsboro, New Jersey by the NJDEP and the EPA in as early as 1975.

200.         Defendant knew or intended that its concealment of, or failure to disclose, the material facts would induce the Plaintiffs to act. Defendant knew that if it disclosed the truth

regarding the elevated contamination levels, Plaintiffs and Class Members would not have worked, lived or visited Gibbsboro, New Jersey.

201.         Defendant had a duty to disclose the material facts for several reasons. First, it is well established that Sherwin-Williams had a duty to disclose known defects to its land, namely elevated levels of hazardous substances, which it created by contaminating the Class Area and failing to properly restore the land in accordance with applicable law. In addition, when Defendant and/or Defendant's agents spoke in conversations to Plaintiffs and Class Members during brief encounters, as well as at a pre-scheduled meeting for residents of Gibbsboro on August 10, 2017 they had the duty to speak the entire truth, not to tell half-truths, and to prevent its words from misleading Plaintiffs and Class Members. And because Defendants had knowledge of material facts to which Plaintiffs and Class Members did not have access, it had a duty to disclose these facts.

202.         Plaintiffs and Class Members detrimentally relied on Defendant's misinformation. If Plaintiffs and Class Members had known the true facts regarding the elevated levels hazardous substances on their residential and commercial properties, they would not have entered transactions to buy or lease the residential and/or commercial properties.

203.         Defendant represented to Plaintiffs, Class Members, and the public that residential and commercial structures that have existed and that have been developed located on or near its manufacturing lands were, among other things, habitable, safe, high quality, good investments, good values, "the result of a depth of resources and an even deeper commitment to being a model corporate citizen," and that they exhibited the "preservation of the natural environment." These representations constitute false statements of material facts or, alternatively, misleading and partial half-truths that fail to disclose all material facts.

204.         Defendant knew that these representations are false, given its extensive manufacturing operations and the notification of the unsafe elevated levels of hazardous substances from the NJDEP and the USEPA.

205.         Consequently, Plaintiffs and Class Members relied on these misrepresentations, thereby causing them injury. Had Plaintiffs and Class Members known the truth, they would not

have entered any transactions at issue due to many concerns, primarily health related ones.

## COUNT IV

## NEGLIGENT MISREPRESENTATION

206.        Defendant made false representations of material facts. Given that Defendant knew for decades that its paint manufacturing lands had elevated levels of hazardous substances, its affirmative statements of fact with Plaintiffs, Class Members, and the public constitute fraudulent misrepresentations.

207.        Defendants represented to Plaintiffs, Class Members, and the public that the Sherwin-Williams Site and surrounding areas, and other residential and commercial developments located on its manufacturing lands were, among other things, habitable, safe, high quality, good investments, good values, "the result of a depth of resources and an even deeper commitment to being a model corporate citizen," and that they exhibited the "preservation of the natural environment." These representations constitute false statements of material facts, misleading statements and partial half-truths that fail to disclose all material facts.

208.        Sherwin-Williams was negligent in making these statements because it should have known these representations were false, given its extensive experience in paint manufacturing operations and that the NJDEP and the USEPA clearly informed Sherwin-Williams of the unsafe elevated hazardous substance levels on its manufacturing lands.

209.        Defendant intended to induce Plaintiffs and Class Members to rely on its misrepresentations.

210.        Injury resulted to the Plaintiffs s and Class Members acting in justifiable reliance upon Defendant's misrepresentations. Had Plaintiffs and Class Members known the truth, they would not have entered any real estate transactions at issue.

## COUNT V

## PRIVATE NUISANCE

211.        Defendant's past, present and/or continuing acts and/or omissions constitute a nuisance in that Defendant had used its property in a manner that has resulted in an unreasonable burden and interference on the Plaintiffs and the Class Members in the form of personal harm, inconvenience, annoyance and discomfort incidental to exposure and cleanup of hazardous substances and associated contaminants.

212.        Defendant's past, present and/or continuing activities, acts and/or omissions on the property that they developed that now forms the Paintworks Corporate Center, and other residential and commercial developments constitute a private nuisance resulting in unreasonable interference with Plaintiffs and the Class Members' right to the exclusive use and enjoyment of their properties due to the presence of contamination in the form of hazardous and toxic substances contaminating the properties, surrounding their properties and the surrounding environment, thereby exposing Plaintiffs and the Class Members to hazardous and toxic substances and substantially interfering with Plaintiffs and Class Members free use and enjoyment of their properties.

213.        Defendant's past, present and/or continuing activities, acts and/or omissions on the property that they manufactured paint and disposed of the by-produces of paint now forms the area referred to as the Sherwin-Williams Site, and the land constitute a private nuisance resulting in unreasonable interference with Plaintiffs and the Class Members' right to the exclusive use and enjoyment of their properties due to the presence of contamination in the form of hazardous and toxic substances contaminating the properties surrounding their properties and the surrounding environment, thereby substantially interfering with Plaintiffs and Class Members' use and enjoyment of their own properties.

214.        Defendant's past, present and/or continuing acts and/or omissions, resulting in high levels of contamination in and on and/or failure to remove or properly investigate and remediate this hazardous contamination, and allowing such contamination to remain on

Plaintiffs' properties, the surrounding properties, and the surrounding environment, constitutes a nuisance in that Defendant has contaminated its property in a manner that has unreasonably interfered with Plaintiffs and Class Members' property interests, health and safety.

215.     Defendant's past, present and/or continuing acts and/or omissions, resulting in high levels of hazardous contamination in and on and/or failure to remove or properly investigate and remediate this contamination, and allowing such contamination to remain on the private properties surrounding Plaintiffs properties constitutes a nuisance in that Defendant will now have to engage in extensive and disruptive remediation and removal of these contaminants that will result in unreasonable interference with Plaintiffs and Class Members'' use and enjoyment of their property interests.

216.     Defendant's contamination presently impacts Plaintiffs and Class Members, causes a diminution in their property values, is a blight on Plaintiffs and Class Members' community, causes annoyance, interference and inconvenience and deprives Plaintiffs and Class Members of their free use and enjoyment of their property, including, but not limited to, the inability to fully use, enjoy and recreate on his outdoor spaces, freely perform certain work and repairs on their property; and requiring property to be dug up, excavated, handled with extreme caution and otherwise disrupted causing inconvenience and disruption. Plaintiffs and Class Members additionally suffer fear of adverse health effects, including cancer and other latent, serious illness.

217.     In the alternative, Defendant's disposal of and/or failure to remove hazard contamination from the Class Area violates applicable standards and/or regulations, which constitutes a nuisance per se.

218.     Defendant knew that the invasion of contaminants onto Plaintiffs and Class Members' properties was substantially certain to result from its actions and/or omissions, as aforesaid.

219.     This interference with Plaintiffs' and the Class Members' use and enjoyment of their property is and will continue to be substantial, unreasonable, unwarranted and unlawful.

220.     As a result of Defendant's wrongful acts and omissions, Plaintiffs and the Class

Members have suffered and will suffer exposure to hazardous substances, annoyance, inconvenience, discomfort, displacement, fear of adverse health effects and economic loss for which damages and medical monitoring are justified.

221.        As a direct and proximate result of Defendant's misconduct, Plaintiffs and Class Members have suffered and will continue to suffer economic losses and the loss of value to their property and other damages.

222.        The nuisance that Defendant created is a continuing nuisance in that it has continued and remains unabated.

223.        Separate and apart from acting negligently, at all relevant times the Defendant caused injury and damages to the Plaintiffs, Class Members and/or their property through acts and omissions actuated by actual malice and/or accompanied by a wanton and willful disregard of persons who foreseeably might be harmed by such acts or omissions.

224.        Defendant, despite its knowledge of the serious health and environmental effects associated with exposure to hazardous contaminants failed to properly investigate and remediate said contaminants from the surrounding environment, and had knowledge that the land had been, is, or would be developed into real estate for commercial and residential use at the same time as failing to warn purchasers and residents of the dangers of such contaminants.

225.        Defendant, despite its knowledge of the serious health and environmental effects associated with exposure to such contaminants, masked the true extent of contamination, thereby enabling the Defendants to avoid taking all appropriate steps to properly remediate said contamination to mitigate its dangers in the Class Areas.

226.        Defendant, despite its knowledge of the serious health and environmental effects associated with exposure to such contaminants, failed to properly remediate such contamination in the Class Area.

## COUNT VI
## STRICT LIABILITY – ABNORMALLY DANGEROUS ACTIVITY

227.        Defendant, by contaminating and then failing to properly restore the Sherwin-

Williams Site and surrounding areas as to allow for residential and commercial use and without disclosure of the hazardous risk posed by this use of the land has engaged in an activity that is abnormally dangerous, ultra-hazardous, and inherently or intrinsically dangerous activities for which they are strictly liable to the Plaintiffs and Class Members.

228.        Defendant's activities pose a high degree of risk of harm to Plaintiffs and Class Members. The likelihood that the harm that results from the Defendant's activities will be great is based upon the fact that the hazardous substance levels are significantly elevated above acceptable NJDEP and USEPA background levels and therefore these contaminants present serious health risks (including cancer).

229.        Defendant's paint manufacturing operations and improper restoration of contaminated lands with actual knowledge that the property would be most likely be developed for commercial and/or residential use is abnormally dangerous and that danger cannot be eliminated through the use of reasonable care, as such development is inherently unreasonably dangerous. There is no safe way to house people on these lands that have not been properly treated or remediated and therefore the hazardous contamination levels pose unreasonably unsafe hazards.

230.        Defendant's paint manufacturing operations and inadequate restoration of the waste areas and failure to properly investigate, delineate, remediate and warn Plaintiffs and the Class Members about the high hazardous substance levels in the Class Areas was neither a matter of common usage nor appropriate to the place where it was carried out.

231.        Exposure to significantly elevated levels of hazardous substances leading to the increased risk of health impacts, including cancer, is a critical societal problem in New Jersey, and thus, the value of Defendant's activities, including its inadequate remediation, is substantially outweighed by the serious health and environmental and health problems caused by them.

232.        As a direct and proximate result of Defendant's misconduct as set forth herein, Plaintiffs and Class Members have suffered and continue to suffer enhanced risk of future personal injury; economic losses, such as costs of medical monitoring; the loss of value to their property; and other damages as set forth herein.

233.        Separate and apart from acting negligently, at all relevant times the Defendant caused injury and damages to the Plaintiffs, Class Members, and/or their property through acts and omissions actuated by actual malice and/or accompanied by a wanton and willful disregard of persons who foreseeably might be harmed by such acts or omissions.

234.        Defendant, despite its knowledge of the serious health and environmental effects associated with exposure to radiation, failed to properly investigate and remediate said contaminants from the land while failing to warn residents, visitors and the public of the dangers of such contamination.

235.        Defendant, despite its knowledge of the serious health and environmental effects associated with exposure to such contaminants, masked the true extent of contamination, thereby enabling it to avoid taking all appropriate steps to properly remediate the contamination or to mitigate dangers in the Class Areas.

236.        Defendant, despite its knowledge of the serious health and environmental effects associated with exposure to the hazardous substances failed to properly remediate such contamination prior to development for commercial and/or residential use.


**JURY TRIAL DEMAND AND PRAYER FOR RELIEF**

Plaintiffs and Class Members hereby demand a trial by jury.

WHEREFORE, Plaintiffs and Class Members request that the Court enter an order or judgment against defendants as follows:

A.        Enter an Order pursuant to Federal Rule 23 permitting this action to be maintained as a class action, Plaintiffs as the representative of the sub-classes and appointing Plaintiffs' counsel as counsel for such classes;

B.        Enter judgment against Defendants for compensatory damages; the prompt testing,

assessment, excavation and removal of all hazardous wastes and related contaminants to levels otherwise representative of background levels from Plaintiffs and Class Members' properties; the cost of periodic medical examinations necessary to detect the onset of physical harm, including, serious latent injury and/or disease that may be caused by contaminants on and around Plaintiffs property; attorneys' fees, costs of suit as provided for by law; and such other relief as the Court may deem just and proper in favor of Plaintiffs and the Class Members against Sherwin-Williams for loss of property value, and for all other relief, in an amount to be proven at trial, as to which they may be entitled, including interest, expert fees and costs of this suit;

C.     Enter an injunction requiring Sherwin-Williams to promptly and completely remediate hazardous chemical levels to, or below, NJDEP and USEPA background levels from the Plaintiffs and Class Members' properties;

D.     Award prejudgment and post-judgment interest as provided by law;

E.     Award punitive damages; and

F.     Such other relief as this Court deems necessary, just and proper.

Dated: August 21, 2017                          MITNICK LAW OFFICE, LLC

                                                BY:

                                                Craig R. Mitnick
                                                Attorney for PLAINTIFFs

## DEMAND FOR JURY TRIAL

PLAINTIFFs demand a trial by jury as to all claims so triable in this action.

Dated: August 21, 2017                          MITNICK LAW OFFICE, LLC

                                                BY:

Craig R. Mitnick
Attorney for PLAINTIFFs


CERTIFICATE OF SERVICE

I hereby certify that on August _____, 2017, a true and correct copy of the foregoing Class

Action Complaint was served personally and electronically on all parties registered to receive

electronic notice via the Court's CM/ECF system.


_____

CRAIG R. MITNICK, ESQ
MITNICK LAW OFFICE, LLC
35 Kings Highway East
Haddonfield, New Jersey 08033